## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
NATIONAL FAIR HOUSING                    )
ALLIANCE, *et al.*,                      )
                                         )
         *Plaintiffs*,                   )
                                         )
v.                                       )          No. 1:18-cv-1076-BAH
                                         )
BENJAMIN S. CARSON, SR., M.D., in        )
his official capacity as Secretary of    )
Housing and Urban Development, *et al.*, )
                                         )
         *Defendants*.                   )
_____)

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
## PRELIMINARY INJUNCTION AND EXPEDITED SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

    I.    Statutory and Regulatory Background. ............................................... 3

        A.  HUD Grant Programs. ............................................................. 3

        B.  The Fair Housing Act and Affirmatively Furthering Fair Housing. .............. 4

        C.  The AFFH Rule and Assessments of Fair Housing. ..................................... 6

        D.  Assessment Tools ..................................................................... 10

    II.   Extensions of AFH Due Dates. ......................................................... 11

    III.  The Withdrawal of LG2017. ............................................................. 12

    IV.  This Litigation. ................................................................................. 14

STANDARD OF REVIEW .............................................................................. 14

ARGUMENT ................................................................................................... 15

    I.    Plaintiffs Are Unlikely to Succeed Because They Lack Standing. .................... 15

        A.  Plaintiffs fail to establish organizational injury. ........................................ 16

        B.  Plaintiffs cannot establish traceability or redressability. ............................. 19

    II.   Plaintiffs Fail to Establish a Likelihood of Success on the Merits. ................... 22

        A.  The withdrawal of LG2017 was procedurally proper. ................................. 23

        B.  HUD acted reasonably in withdrawing LG2017. ....................................... 26

              1.  HUD reasonably concluded that the high AFH failure rate evidenced significant defects with LG2017 ..................................... 27

              2.  HUD reasonably concluded that it lacked sufficient resources to continue implementing LG2017 in 2018 and 2019. .......................... 29

              3.  HUD reasonably traced these issues to LG2017 ............................... 33

4.   HUD reasonably concluded that withdrawal of LG2017 was an
appropriate means of addressing the issues identified. ...................... 36

5.   HUD reasonably withdrew LG2017 under the AFFH Rule. ............. 37

C.   Withdrawal of LG2017 is not contrary to the Fair Housing Act. ............. 38

III.   Plaintiffs Have Not Shown that Irreparable Harm Will Result If This
Court Does Not Reinstate LG2017 on an Emergency Basis. ........................... 40

IV.   The Public Interest and Balance of Equities Weigh in Favor of the
Government ......................................................................................... 42

V.   Final Judgment Is Inappropriate at This Early Stage. ........................................ 44

CONCLUSION ............................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*AARP v. EEOC,*
226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................................... 15, 44

*Am. Ass'n of Cosmetology Schs. v. DeVos,*
258 F. Supp. 3d 50 (D.D.C. 2017) ............................................................................... 36

*Am. Freedom Law Ctr. v. Obama,*
821 F.3d 44 (D.C. Cir. 2016) ...................................................................................... 22

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987) ..................................................................................................... 43

*Arpaio v. Obama,*
797 F.3d 11 (D.C. Cir. 2015) ................................................................................. 19, 20

*Arriva Med. LLC v. HHS,*
239 F. Supp. 3d 266 (D.D.C. 2017) ............................................................................ 41

*\* ASPCA v. Feld Entm't, Inc.,*
659 F.3d 13 (D.C. Cir. 2011) ...................................................................................... 16

*Cayuga Nation v. Zinke,*
No. 17-cv-1923 (CKK), 2018 WL 1515239 (D.D.C. Mar. 27, 2018) ......................... 41

*\* Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ......................................................................... 40, 41, 42

*Chesapeake Climate Action Network v. Ex.-Im. Bank of the U.S.,*
78 F.3d 208 (D.D.C. 2015) .......................................................................................... 17

*Clean Air Council v. Pruitt,*
862 F.3d 1 (D.C. Cir. 2017) ........................................................................................ 24

*Common Cause v. Biden,*
748 F.3d 1280 (D.C. Cir. 2014) .................................................................................. 21

*Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell,*
830 F.3d 552, 558 (D.C. Cir. 2016) ............................................................................ 39

*Ctr. for Law & Educ. v. Dep't of Educ.,*
396 F.3d 1152 (D.C. Cir. 2005) .................................................................................. 17

*Daily Caller v. U.S. Dep't of State,*
   152 F. Supp. 3d 1 (D.D.C. 2015) ................................................................. 45

*Dorfmann v. Boozer,*
   414 F.2d 1168 (D.C. Cir. 1969) ................................................................. 44

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ................................................................. 38

*EPIC v. U.S. Dep't of Educ.,*
   48 F. Supp. 3d 1 (D.D.C. 2014) ................................................................. 18

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury,*
   857 F.3d 913 (D.C. Cir. 2017) ................................................................. 26, 27

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.,*
   28 F.3d 1268 (D.C. Cir. 1994) ................................................................. 41

*Fisher v. Pension Benefit Guar. Corp.,*
   151 F. Supp. 3d 159 (D.D.C. 2016) ................................................................. 38

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ................................................................. 16, 18

*Freedom Republicans, Inc. v. FEC,*
   13 F.3d 412 (D.C. Cir. 1994) ................................................................. 20

*Friends of Animals v. U.S. Bureau of Land Mgmt.,*
   232 F. Supp. 3d 53 (D.D.C. 2017) ................................................................. 43

*Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ................................................................. 41, 42

*Gentiva Healthcare Corp. v. Sebelius,*
   857 F. Supp. 2d 1, 6 (D.D.C. 2012) ................................................................. 14, 45

*Gonzales v. Oregon,*
   546 U.S. 243 (2006) ................................................................. 38

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ................................................................. 16, 41

*Henry v. Sec'y of Treasury,*
   266 F. Supp. 3d 80 (D.D.C. 2017) ................................................................. 45

*Hispanic Affairs Project v. Perez,*
  141 F. Supp. 3d 60 (D.D.C. 2015) ........................................................................ 44

*Intercity Transp. Co. v. United States,*
  737 F.2d 103 (D.C. Cir. 1984) ............................................................................. 26

*James V. Hurson Assocs., Inc. v. Glickman,*
  229 F.3d 277 (D.C. Cir. 2000) ............................................................................. 25

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,*
  88 F.3d 1191 (D.C. Cir. 1996) ............................................................................. 25

*La. Pub. Serv. Comm'n v. FERC,*
  184 F.3d 892 (D.C. Cir. 1999) ............................................................................. 37

*League of Women Voter of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................... 16, 41, 43

* *Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................... 15, 16, 19, 20

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...................................................................................... 31-32

*Mayo v. Reynolds,*
  875 F.3d 11 (D.C. Cir. 2017) .............................................................................. 27

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................... 14

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ..................................................................... 23, 24

*Mingo Logan Coal Co. v. EPA,*
  829 F.3d 710 (D.C. Cir. 2016) ............................................................................ 27

*Morgan Drexen, Inc. v. CFPB,*
  785 F. 3d 684 (D.C. Cir. 2015) ........................................................................... 19

* *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................................. 27

*Mylan Labs. Ltd. v. FDA,*
  910 F. Supp. 2d 299 (D.D.C. 2012) .................................................................... 42

*NAACP v. Sec'y of Hous. & Urban Dev.*,
817 F.2d 149 (1st Cir. 1987) ........................................................................ 40

*Nat'l Ass'n of Home Builders v. EPA*,
667 F.3d 6 (D.C. Cir. 2011) .......................................................................... 17

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ...................................................................... 36

\* *Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) ........................................................... 16, 17, 19

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004) ................................................................ 20, 22

*Nio v. DHS*,
270 F. Supp. 3d 49 (D.D.C. 2017) ............................................................... 38

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................................................... 43

*Otero v. N.Y.C. Hous. Auth.*,
484 F.2d 1122 (2d Cir. 1973) ....................................................................... 40

*PETA v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) .................................................................... 18

*Pinson v. DOJ*,
273 F. Supp. 3d 1 (D.D.C. 2017) ................................................................. 42

*Renal Physicians Ass'n v. HHS*,
489 F.3d 1267 (D.C. Cir. 2007) .................................................................... 20

*Sandoz Inc. v. FDA*,
No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006) ........................ 44

*Sandoz, Inc. v. FDA*,
439 F. Supp. 2d 26 (D.D.C. 2006) ............................................................... 44

*Save Jobs USA v. DHS*,
210 F. Supp. 3d 1 (D.D.C. 2016) ................................................................. 19

*Shannon v. HUD*,
436 F.2d 809 (3d Cir. 1970) ........................................................................ 40

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................. 14

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ................................................................................. 16

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................ 15, 16

*St. Vincent's Med. Ctr. v. Burwell*,
    222 F. Supp. 3d 17 (D.D.C. 2016) ......................................................... 38

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................................... 19

*Thompson v. HUD*,
    348 F. Supp. 2d 398 (D. Md. 2005) ........................................................ 40

*Turlock Irrigation Dist. v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015) .................................................................. 16

*United Source One, Inc. v. USDA, Food Safety & Inspection Serv.*,
    865 F.3d 710 (D.C. Cir. 2017) ........................................................... 25, 27

*United Transp. Union v. ICC*,
    891 F.2d 908 (D.C. Cir. 1989) ................................................................ 20

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ................................................................................. 44

*US Ecology, Inc. v. U.S. Dep't of Interior*,
    231 F.3d 20 (D.C. Cir. 2000) .................................................................. 21

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................. 19

*WildEarth Guardians v. EPA*,
    751 F.3d 649 (D.C. Cir. 2014) ................................................................ 32

* *Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................... 14, 41, 43

## STATUTES

5 U.S.C. § 553 ........................................................................................................ 2, 23

5 U.S.C. § 706 ................................................................................... 14, 22, 26, 38

42 U.S.C. § 12705 ................................................................................................ 4, 39

42 U.S.C. §§ 1437c-1 *et seq* ............................................................................... 4, 39

42 U.S.C. § 3531 ...................................................................................................... 3

42 U.S.C. § 3601 ...................................................................................................... 4

* 42 U.S.C. § 3608 ..................................................................................... 2, 5, 38, 39

42 U.S.C. §§ 3501 *et seq* ........................................................................................ 3

42 U.S.C. § 5304 ............................................................................................... 4, 5, 39

42 U.S.C. § 5306 ..................................................................................................... 39

42 U.S.C. §§ 3604-06 ............................................................................................... 5

42 U.S.C. §§ 11371 *et seq* ....................................................................................... 3

42 U.S.C. §§ 12705 ................................................................................................. 39

42 U.S.C. §§ 12741 *et seq* ....................................................................................... 3

42 U.S.C. §§ 12901 *et seq* ....................................................................................... 4

44 U.S.C. ch. 35 ....................................................................................................... 7

44 U.S.C. §§ 3501 *et seq* ....................................................................................... 23

44 U.S.C. §§ 3502 .............................................................................................. 23, 39

44 U.S.C. § 3504 ..................................................................................................... 24

44 U.S.C. § 3506 ........................................................................................... 2, 23, 24, 39

44 U.S.C. § 3507 ........................................................................................... 2, 23, 24, 25

Civil Rights Act of 1968, tit. VIII,
   Pub. L. No. 90-284, 82 Stat. 73 (codified at 42 U.S.C. § 3601) .................................... 4

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

5 C.F.R. § 1320.10 ...................................................................................................... 24

24 C.F.R. pt. 91 .......................................................................................................... 4

24 C.F.R. pt. 903, subpt. B ......................................................................................... 4

24 C.F.R. § 5.150 ........................................................................................................ 6

24 C.F.R. § 5.151 .................................................................................................. 9, 40

* 24 C.F.R. § 5.152 ....................................................................................... 6,7, 23, 25

24 C.F.R. § 5.154 ........................................................................................................ 7

* 24 C.F.R. § 5.160 ......................................................................................... 8, 9, 13, 24

24 C.F.R. § 5.162 ................................................................................................... 8, 29

24 C.F.R. § 91.105 .................................................................................................... 34

24 C.F.R. § 91.225 ................................................................................................... 4, 6

24 C.F.R. § 91.325 ...................................................................................................... 6

24 C.F.R. § 903.7 ..................................................................................................... 4, 6

24 C.F.R. § 903.15 ...................................................................................................... 6

48 Fed. Reg. 13,666 (Mar. 31, 1983). ..................................................................... 24

* 80 Fed. Reg. 42,272 (July 15, 2015) ................................................................ passim

80 Fed. Reg. 81,840 (Dec. 31, 2015) ...................................................................... 10

81 Fed. Reg. 73,129 (Oct. 24, 2016) ........................................................................ 11

82 Fed. Reg. 4373 (Jan. 13, 2017) ............................................................... 10, 11, 29

82 Fed. Reg. 4388 (Jan. 13, 2017) ........................................................................... 10

83 Fed. Reg. 683 (Jan. 5, 2018) ......................................................................... 11, 12

* 83 Fed. Reg. 23,922 (May 23, 2018) ................................................................ passim

83 Fed. Reg. 23,927 (May 23, 2018) .................................................................................... 13

83 Fed. Reg. 23,928 (May 23, 2018) .................................................................................... 13

# INTRODUCTION

The Department of Housing and Urban Development (HUD) provides federal funding for a variety of housing and community development programs, including block-grant funding to states and local governments.  To receive federal funds, these jurisdictions must submit to HUD certain planning documents and certify that they will comply with a number of statutes and regulations, including a statutory directive to affirmatively further fair housing.  To help ensure that jurisdictions are meeting their statutory obligations to affirmatively further fair housing, HUD has required states and local governments receiving federal funds to engage in a fair-housing planning process.  Before 2015, HUD required these states and local governments to conduct an analysis of impediments to fair housing.  In 2015, HUD promulgated the Affirmatively Furthering Fair Housing (AFFH) Rule, which adopted a new process—an assessment of fair housing (AFH)—that would, over time, replace the analysis of impediments.

This new AFH process has been rolled out incrementally, with initial due dates staggered across years to give HUD time to develop and evaluate the new process.  As of mid-2018, most HUD program participants have never been required to submit an AFH.  That is in part because the AFH submission due date is premised on the publication of an Assessment Tool, a template that helps program participants conduct the AFH.  Because of the differences among the program participants subject to the AFFH Rule, HUD had determined to develop distinct assessment tools for three separate categories of program participants: local governments, public housing agencies (PHAs), and states and insular areas.  HUD thus far has published an operative Assessment Tool only for local governments, and because of the staggered due dates, only a small fraction of local governments have been required to submit an AFH.  HUD found that most local governments that have attempted to use the tool could not successfully submit an acceptable AFH without

substantial and costly assistance from HUD.  In light of this difficulty using the tool and the unexpected burdens on HUD, HUD decided to withdraw the local government tool.  Because AFH due dates are, by regulation, tied to the availability of the tool, local governments were then subject to an automatic extension of AFH due dates, like all other grantees without a tool.

Plaintiffs, nonprofit organizations, sued.  They argue that the withdrawal of the tool was procedurally improper, arbitrary and capricious, and contrary to law, and they seek emergency relief from this Court.  As an initial matter, the Court should reject that extraordinary request because Plaintiffs lack standing to sue.  They are not regulated entities or aggrieved parties; they are advocacy organizations that disagree with HUD's policy choices and seek to superintend its regulatory programs.  But Plaintiffs lack a cognizable organizational injury, and in any event all of their asserted harms are properly traced not to HUD, but to the local governments that they contend are not meeting the independent obligation to affirmatively further fair housing.

Regardless, Plaintiffs' claims fail on the merits.  Although Plaintiffs suggest the withdrawal of the tool was defective for failure to go through notice-and-comment procedures under the Administrative Procedure Act, 5 U.S.C. § 553, those procedures are reserved for legislative rules, and an Assessment Tool—an information-collection device—is no such thing. Indeed, collections of information are governed by an entirely different procedural statute, the Paperwork Reduction Act, 44 U.S.C. §§ 3506-07.  HUD also provided a reasonable basis for its decision to withdraw the tool, connecting the available facts to the decision made.  And lastly, Plaintiffs suggest that HUD is violating the Fair Housing Act, 42 U.S.C. § 3608, for failing to require local governments (or perhaps all jurisdictions) to immediately begin using the AFH mechanism, but the broad terms of the statute nowhere require any particular regulatory approach.

Because Plaintiffs' claims fail entirely on their merits, this Court should deny a preliminary injunction.  In addition, Plaintiffs fail to establish irreparable harm, instead resting their claim for emergency relief on complaints about their own budgetary decisions about how to allocate their resources.  That is not a cognizable injury, much less evidence of irreparable harm. And both the equities and the public interest weigh against preliminary, emergency relief in this matter.  Given the number of stakeholders across the country and the long-term planning processes at issue, the public would benefit from a final judgment issued after a full consideration of the complete record.  Such an examination is impossible on the expedited, emergency schedule that Plaintiffs have pursued.

For these reasons, the government respectfully requests that this Court deny the motion for a preliminary injunction and for expedited summary judgment.

## BACKGROUND

### I.     Statutory and Regulatory Background.

#### A.  HUD Grant Programs.

HUD is charged with administering "the principal programs of the Federal Government which provide assistance for housing and for the development of the Nation's communities."  42 U.S.C. § 3531.  To that end, HUD provides assistance to state and local governments through block grants for housing and community development.  These programs include the Community Development Block Grants (CDBG), *id.* §§ 5301 *et seq.*, which provide annual grants to provide housing and expand economic opportunities for low- and moderate-income persons; HOME Investment Partnerships (HOME), *id.* §§ 12741 *et seq.*, which provide grants to fund building, buying, and rehabilitating of affordable housing for rent or homeownership and providing rental assistance to low-income persons; Emergency Solutions Grants (ESG), *id.* §§ 11371 *et seq.*,

which provide funding for emergency shelter and services for homeless persons and families, to prevent homelessness, and to provide rental housing assistance for homeless persons and families and those at risk of homelessness; and Housing Opportunities for Persons With AIDS (HOPWA), *id.* §§ 12901 *et seq.*, which provide grants for housing assistance and supportive services that benefit low-income persons living with HIV/AIDS and their families.  HUD also provides grants to PHAs under the U.S. Housing Act (USHA), *id.* §§ 1437c-1 *et seq.*, for public housing operations and capital and for tenant-based rental assistance.

The four block grant programs require state and local governments to conduct annual and longer-term strategic planning of their objectives and projected use of funds for housing, housing affordability, and community activities.  *See, e.g.*, 42 U.S.C. §§ 5304(a)(1), 12705.  HUD refers to this as the Consolidated Plan process, which involves a three- to five-year strategic plan along with annual action plans, the submission of which is a precondition for annual federal funds.  24 C.F.R. pt. 91.  Public housing agencies, with certain exceptions, also must conduct annual and longer-term strategic planning—a PHA Plan—for serving low-income and very low-income families, and the needs of child and adult victims of domestic violence, sexual assault, or stalking.  42 U.S.C. § 1437c-1; 24 C.F.R. pt. 903, subpt. B.  As part of the Consolidated Plan process (and the corresponding PHA Plan process), each program participant must include certifications that it will comply with applicable statutory and regulatory requirements in order to receive federal funds.  *See, e.g.*, 24 C.F.R. §§ 91.225, 903.7.

### B.  The Fair Housing Act and Affirmatively Furthering Fair Housing.

The Fair Housing Act declares that it is "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."  Civil Rights Act of 1968, tit. VIII, § 801, Pub. L. No. 90-284, 82 Stat. 73, 81 (codified at 42 U.S.C. § 3601).  The

4

Act prohibits discrimination in the sale, rental, advertising, brokering, appraising, and financing of dwellings and other housing-related transactions because of race, color, religion, sex, familial status, national origin, or handicap. 42 U.S.C. §§ 3604-06. In addition, the Act imposes on the entire Executive Branch a duty to affirmatively further fair housing. Specifically, "[a]ll executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the purposes of [the Fair Housing Act]." *Id.* § 3608(d). HUD, in particular, "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the Fair Housing Act]." *Id.* § 3608(e)(5). Congress did not define "fair housing" or what it means to "affirmatively further" it. *See id.* § 3608.

In statutes establishing the funding programs described above—CDBG, HOME, ESG, HOPWA, and public housing funding and tenant-based rental assistance—Congress required recipients to certify that they "will affirmatively further fair housing," or "AFFH." *See, e.g.*, 42 U.S.C. §§ 5304(b)(2) (local government recipients), 5306(d)(7)(B) (state recipients), 12705(b)(15) (state and local recipients), 1437c-1(d)(16) (public housing agency recipients). Vested with "[t]he authority and responsibility for administering [the] Act," *id.* § 3608(a), HUD has exercised its discretion to require more from these funding recipients than the statutorily required AFFH certification. To support the certification, HUD requires a participant to conduct specific fair housing planning beyond the statutorily required program planning. Before 2015, a program participant's certification that it will affirmatively further fair housing "mean[t] that it will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that

5

analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. §§ 91.225(a)(1), 91.325(a)(1) (2012). PHA plans required a similar certification. *Id.* § 903.7(*o*) (2010); *see also id.* § 903.15 (2013).

This fair-housing planning process, a procedural mechanism designed to facilitate program participants' satisfaction of their AFFH obligation, is known as an Analysis of Impediments to Fair Housing Choice (AI). The contours of this analysis are set forth in HUD's Fair Housing Planning Guide. *See* HUD, Fair Housing Planning Guide 1-2 to 1-5 (1996), *available at* https://www.hud.gov/sites/documents/fhpg.pdf. The Fair Housing Planning Guide walks program participants through the statutory requirements and provides step-by-step instructions on how to satisfy the three distinct parts of the AFFH obligation—completing an AI, eliminating impediments to fair housing, and maintaining records. *Id.* chs. 2-5.

### C. The AFFH Rule and Assessments of Fair Housing.

In July 2015, HUD promulgated the Affirmatively Furthering Fair Housing (AFFH) Rule, which adopted a new planning process to assist program participants in certifying that they will affirmatively further fair housing. 80 Fed. Reg. 42,272 (2015). The Rule "establish[es] specific requirements for the development and submission of an Assessment of Fair Housing (AFH) by program participants"—replacing the AI—"and the incorporation and implementation of that AFH into subsequent consolidated plans." 24 C.F.R. § 5.150. The AFH consists of "an analysis of fair housing data, an assessment of fair housing issues and contributing factors, and an identification of fair housing priorities and goals." *Id.* § 5.152. Participants are required to conduct an AFH that includes, at a minimum: a summary of fair housing issues and capacity; an analysis of data addressing integration and segregation patterns and trends, racially or ethnically concentrated areas of poverty, significant disparities in access to opportunity, and

disproportionate housing needs; an assessment of fair housing issues; an identification of fair housing priorities and goals; strategies and actions to implement goals and priorities; a summary of community participation; and a review of progress achieved.  *Id.* § 5.154(d).

Beyond these generally applicable standards, program participants' specific AFH requirements are built around information-collection instruments called Assessment Tools, a term that "refers collectively to any forms or templates and the accompanying instructions provided by HUD that program participants must use to conduct and submit an AFH."  24 C.F.R. § 5.152.  Under the regulations, HUD "may"—and does—"provide different Assessment Tools for different types of program participants."  *Id.*  These tools are essentially a series of prompts for which program participants must provide responses.  The tools are not included in the regulations, which contemplate that HUD separately will issue the Assessment Tools and periodically subject each tool to notice and comment in conformance with Office of Management and Budget (OMB) requirements under the Paperwork Reduction Act (PRA), 44 U.S.C. ch. 35.  *Id.*  The tools are a necessary prerequisite to an AFH, as the AFH content requirements must be conducted through the vehicle of the applicable tool.  *Id.* § 5.154(d)(2)-(3).

Another key feature of the AFH process is reliance on data compiled and provided by HUD.  The regulations require that program participants preparing AFHs "will use HUD-provided data . . . and supplement the HUD-provided data, as needed, with local data and local knowledge, as guided by the Assessment Tool."  24 C.F.R. § 5.154(c).  The central analytical components of the AFH—for example, identification of integration and segregation patterns and trends—must be based on this HUD-provided data, as supplemented by local data and knowledge.  *Id.* §§ 5.152, 5.154(d)(2).

Once complete, the AFH is submitted to HUD.  24 C.F.R. § 5.162.  HUD "determine[s]

whether the program participant has met the requirements for providing its analysis, assessment,

and goal setting."  *Id.* § 5.162(a)(1).  If the AFH "meets the required elements," the AFH is

accepted.  *Id.* § 5.162(a)(2).  If the AFH "is inconsistent with fair housing or civil rights

requirements or is substantially incomplete," the AFH is not accepted.  *Id.* § 5.162(b)(1).  If

HUD does not issue a non-accept decision within 60 days, the AFH is "deemed accepted."  *Id.*

§ 5.162(a)(1).  Acceptance is a condition to the receipt of federal funds.  *Id.* § 5.162(d).

Importantly, "[a]cceptance does not mean that the program participant has complied with

its obligation to affirmatively further fair housing" or has otherwise complied with the Act and

other civil rights laws.  24 C.F.R. § 5.162(a)(2); *see also* 80 Fed. Reg. at 42,320.  The AFFH

Rule "is a planning rule, not a rule directed to the enforcement of the duty to affirmatively

further fair housing."  80 Fed. Reg. at 42,313.  The AFH, in turn, is a planning process designed

to help program participants satisfy their own substantive obligations to affirmatively further fair

housing.  Ultimately, "[i]t is the program participants' responsibility to affirmatively further fair

housing and to set, evaluate, and readjust goals, priorities, strategies and actions to fulfill that

legal duty."  *Id.* at 42,300.  Thus, in promulgating the Rule, HUD specifically concluded that it

would determine only whether to "accept" an AFH, not "approve" it.  *Id.* at 42,315.

The requirement to develop and submit an AFH in support of an AFFH certification did

not come into effect immediately upon finalization of the Rule.  The first submission is tied to

existing Consolidated Plan due dates, which arise at intervals of three to five years.  24 C.F.R.

§ 5.160(a)(1)(i).  The first AFH is required 270 days prior to the first scheduled Consolidated

Plan after a given date.  *See id.*  The Rule staggers the beginning date depending on the type of

program participant, in no case earlier than January 2017.  *See id.* § 5.151.  "The staggered

submission recognizes the capacity challenges, especially of small entities, and it [was] HUD's expectation that by the time their AFHs are due, the AFH approach and submission requirements will be more refined and these small entities and HUD can benefit from the experience of program participants that have already submitted AFHs." 80 Fed. Reg. at 42,318. PHA requirements are similarly tied to regular planning deadlines. 24 C.F.R. § 5.160(a)(1)(i)(D)-(E).

An upcoming Consolidated or PHA Plan deadline is only a necessary, not a sufficient, condition to trigger participants' requirement to submit an AFH. Because a tool is necessary to conduct an AFH, the requirement does not come into effect unless HUD has issued a finalized Assessment Tool for the relevant category of participants, including the requisite data. 24 C.F.R. § 5.160(a)(1)(ii). If normal operation of the deadlines "would result in a first AFH submission date that is less than 9 months after the date of publication of the Assessment Tool that is applicable to the program participant," "the participant(s)' submission deadline will be extended as specified in that Assessment Tool publication to a date that will not be less than 9 months from the date of publication of the Assessment Tool." *Id.*

Given the staggered implementation, multiple years between planning cycles, and contingency on an Assessment Tool, the AFFH Rule contemplates that many program participants will not be required to submit an AFH until years after the July 2015 promulgation of the Rule. Consequently, the Rule makes clear that program participants are still required to comply with their longstanding AFFH obligations regardless when the AFH submission requirement is triggered, and thus "shall continue to conduct an analysis of impediments . . . in accordance with requirements in effect prior to August 17, 2015" until the AFH submission requirement arises. 24 C.F.R. § 5.151. In sum, program participants continue to be required to

comply with the statutory standard—affirmatively furthering fair housing—through the AI process during the gradual phasing in of the new AFH process under the AFFH Rule.  *See id.*

### D.  Assessment Tools.

Because of the differences among program participants, HUD decided to develop separate Assessment Tools for local governments, public housing agencies, and states and insular areas. HUD published the first tool—the Local Government Assessment Tool—in December 2015.  80 Fed. Reg. 81,840 (Dec. 31, 2015); *see also* Declaration of Krista Mills ("Mills Decl.") Ex. 10 (LG2015).  The publication of this iteration of the tool, known as LG2015, triggered the requirement for covered local governments to submit an AFH.  80 Fed. Reg. at 81,840.  OMB, which holds PRA regulatory authority over the tools, approved LG2015 for a period of only one year.  *See id.*  Only twenty AFHs were using LG2015.  Mills Decl. ¶ 35.

HUD began the process for renewing the Local Government Assessment Tool in 2016.  82 Fed. Reg. 4388 (Jan. 13, 2017).  Consistent with the PRA, HUD engaged in two rounds of notice and comment to renew the tool.  *Id.* at 4388-89.  After obtaining OMB approval, the new iteration of the tool—called LG2017—was published in January 2017.  *Id.* at 4388; *see also* Mills Decl. Ex. 11 (LG2017).  OMB approved LG2017 for three years.

In January 2017, after completing two PRA comment periods, HUD also published a tool for public housing agencies.  82 Fed. Reg. 4373 (Jan. 13, 2017).  This new PHA Assessment Tool received OMB approval for three years, but "d[id] not trigger the obligation of PHAs to conduct and submit an AFH . . . as HUD ha[d] not yet provided PHAs with the data they will need."  82 Fed. Reg. at 4373.  Without the relevant data, the PHA Assessment Tool was not operable.  Thus, HUD explained that "[a]s HUD makes data available for certain PHAs, HUD will publish, in the Federal Register, a Notice announcing the availability of data for certain

PHAs, triggering their obligation to conduct and submit an AFH." 82 Fed. Reg. at 4373.  HUD

emphasized that "[u]ntil such time that PHAs are required to conduct and submit an AFH

. . . PHAs must continue to comply with existing fair housing and civil rights requirements." *Id.*

As of this filing, HUD has not published a notice of the availability of data for PHAs.  HUD also

has not published a tool for jurisdictions other than local governments.

## II. Extensions of AFH Due Dates.

When promulgating the AFFH Rule, HUD anticipated that AFH submission requirements

would need to be "refined" as the new process unfurled.  80 Fed. Reg. at 42,318; *see also, e.g.*,

Comparison of LG2015 and LG2017, Mills Decl. Ex. 12.  To that end, HUD has twice extended

AFH due dates.  In late 2016, HUD announced that it was "extending the AFH submission

deadline for the first AFH submission" for certain small grantees.  81 Fed. Reg. 73,129, 73,130

(Oct. 24, 2016).  The date triggering the AFH submission due dates for these local governments

originally was set at January 1, 2018, and by this notice extended to January 1, 2019.  *See id.* at

73,129-30.  Pending an applicable AFH due date, program participants subject to this extension

were instructed to "comply with existing, ongoing obligations to affirmatively further fair

housing" through the certification process that includes an AI.  *Id.*

HUD then began receiving AFHs from a small, initial round of local governments with

Consolidated Plan due dates in the applicable timeframe.  Mills Decl. ¶ 10.  In 2017, HUD

conducted an analysis of the first 49 AFH submissions from local governments that the agency

determined to be accepted, non-accepted, or deemed accepted.  83 Fed. Reg. 683 (Jan. 5, 2018);

*see also* Mills Decl. ¶ 11 & Ex. 1.  HUD concluded that "local government program participants

need additional time and technical assistance from HUD to adjust to the new AFFH process and

complete acceptable AFH submissions."  83 Fed. Reg. at 685.  HUD decided to extend the

deadline for submission of AFHs to program participants through October 31, 2020.  *Id*. at 684.

HUD issued a notice of this extension in the Federal Register on January 5, 2018.  83

Fed. Reg. at 683.  HUD emphasized that "program participants must continue to comply with

existing, ongoing obligations to affirmatively further fair housing" and continue to conduct an AI

and certify AFFH compliance, the requirements in effect prior to the adoption of the AFFH Rule.

*Id.* at 685.  Program participants that had already submitted an accepted AFH were required to

continue to abide by the terms of the AFH, and HUD explained that covered program

participants "that may have already begun work on an AFH may continue to do so, as the AFFH

rule may provide program participants with a useful framework for complying with their AFFH

obligation."  *Id.*  However, HUD discontinued the review of AFHs still under review and

instructed covered participants not to submit new AFHs.  *Id.*

### III.    The Withdrawal of LG2017.

On May 23, 2018, HUD published three additional notices in the Federal Register.  First,

HUD announced the withdrawal of the January 5 notice extending AFH deadlines, effective

immediately.  83 Fed. Reg. 23,928 (May 23, 2018).  HUD explained that "[i]f HUD later finds it

prudent to revise the regulations, including by revising the submission schedule, HUD will

publish a notice of proposed rulemaking to that effect for public comment."  *Id.*

Second, HUD announced the withdrawal of LG2017.  83 Fed. Reg. 23,922 (May 23,

2018).  HUD determined that the issues that led the agency to extend AFH deadlines in the

January 5 notice stemmed from problems with LG2017.  Specifically, HUD concluded that the

high failure rate for the initial round of 49 AFH submissions—with 63% of submissions initially

not acceptable—evidenced that LG2017 was ineffective at assisting program participants and

12

insupportably burdensome.  83 Fed. Reg. at 23,922; *see also* Mills Decl. ¶¶ 9, 16.  HUD

identified a number of problems in these AFHs rooted in LG2017: inadequate community

participation, insufficient use of local data and knowledge, insufficient regional analysis, failure

to identify factors contributing to fair housing issues, failure to correctly prioritize contributing

factors, inadequate goal-setting, and duplicative responses.  83 Fed. Reg. at 29,923-25.

HUD further concluded that it lacked sufficient resources to provide the assistance

required to support the expanding number of grantees with upcoming AFH submissions.  83 Fed.

Reg. at 29,925-26.  HUD thus decided to "withdraw[] the Tool to produce a more effective and

less burdensome Assessment Tool" and "make it more effective in assisting program participants

with the creation of meaningful assessments with impactful fair housing goals to help them plan

to fulfill their legal obligation to affirmatively further fair housing," as well as "conserve HUD's

limited resources, allowing HUD to use those limited resources more effectively to help program

participants produce meaningful improvements in the communities they serve."  *Id.* at 29,926.  In

the meantime, HUD continues to provide AFFH technical assistance for AIs and has allocated

resources otherwise devoted to AFHs to pursuing other civil rights initiatives.  Mills Decl. ¶¶ 28,

36.  HUD also "continues to consider other potential ways of improving participants' fair

housing planning, including the option of an Advanced Notice of Proposed Rulemaking

('ANPR') that would seek public comment on potential changes to the AFFH rule."  *Id.* ¶ 37.

Under the Rule, the withdrawal resulted in an automatic extension of AFH submissions

pending republication.  83 Fed. Reg. at 23,926; 24 C.F.R. § 5.160(a)(1)(ii).  In the meantime, the

Rule requires local governments to continue to perform an AI, consistent with the requirements

in effect prior to August 17, 2015.  24 C.F.R. § 5.160(a)(3).  HUD thus reminded local

governments "that the legal obligation to affirmatively further fair housing remains in effect, and

13

that HUD places a high priority upon the responsibility of program participants to ensure that their AIs serve as effective fair housing planning tools." 83 Fed. Reg. 23,927 (May 23, 2018).

## IV.     This Litigation.

On May 8, 2018, Plaintiffs—the National Fair Housing Alliance, Texas Low Income Housing Information Service, and Texas Appleseed—filed a complaint challenging the January 5 extension of AFH submission deadlines.  ECF No. 1.  Plaintiffs also filed a motion for preliminary relief and expedited summary judgment, ECF No. 2, seeking relief under the Administrative Procedure Act (APA), 5 U.S.C. § 706.  On May 29, 2018, Plaintiffs amended their complaint to challenge the May 23 withdrawal of LG2017 and filed the instant renewed motion for preliminary relief and expedited summary judgment.  ECF Nos. 18, 19.

## STANDARD OF REVIEW

Plaintiffs seek a preliminary injunction requiring HUD to reinstate LG2017.  A preliminary injunction is "an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  The movant must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter*, 555 U.S. at 20).

Plaintiffs also seek summary judgment.  In actions arising under the Administrative Procedure Act (APA), 5 U.S.C. § 706, judicial review proceeds on an administrative record, and summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA

standard of review." *Gentiva Healthcare Corp. v. Sebelius*, 857 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013).

## ARGUMENT

### I.      Plaintiffs Are Unlikely to Succeed Because They Lack Standing.

The Court should deny Plaintiffs' motion because Plaintiffs lack Article III standing. "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "Where, as here, a plaintiff seeks a preliminary injunction, 'the plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment.'" *AARP v. EEOC*, 226 F. Supp. 3d 7, 15 (D.D.C. 2016). Plaintiffs, nonprofit organizations, lack standing because they fail to establish a cognizable injury. Plaintiffs are not the subject of the AFFH Rule, nor are Plaintiffs required to use LG2017. Rather, their principal claim is that they, like HUD, work to further fair housing. Plaintiffs argue that they work with local governments that would have been required to use LG2017 to prepare an AFH, and that their expenditures on advocacy, education, and counseling activities reflect the applicable HUD requirements—here, the requirement of an AI or an AFH. But Plaintiffs' decisions about how to organize their advocacy budgets around whatever public policy is in effect are insufficient to establish organizational standing. And that is particularly true where, as here, any such expenditures on fair housing are properly attributed to the local governments that Plaintiffs believe are not providing fair housing opportunities, not HUD.

### A.  Plaintiffs fail to establish organizational injury.

To establish injury, a plaintiff must have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).  Courts do not entertain claims of "organizations 'who seek to do no more than vindicate their own value preferences,'" and "an organization's abstract interest in a problem is insufficient to establish standing, 'no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem.'"  *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24-25 (D.C. Cir. 2011) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).  An organization must demonstrate a "'concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constituting . . . more than simply a setback to the organization's abstract social interests.'"  *Nat'l Taxpayers Union, Inc. v. United States* ("*NTU*"), 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'"  *Id.*

Here, Plaintiffs claim that the withdrawal of LG2017 "'perceptibly impaired' the organization's ability to provide services."  *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).  To establish standing on this basis, Plaintiffs must point to some "'inhibition of [the organization's] daily operations' in order to establish injury in fact," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015), and may not rest on "a 'self-inflicted' budgetary choice" to maintain standing.  *ASPCA*, 659 F.3d at 25; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (noting that the "question is whether 'a defendant's conduct has made the organization's *activities* more difficult'").

16

Plaintiffs seek to cast their general dissatisfaction with HUD's regulation of third parties into an issue of their own expenditures on education, counseling, and advocacy. Pls.' Mem. 35-43, ECF No. 19-11. But these expenditures are not cognizable injuries. Plaintiffs engage in these activities regardless of the current HUD regulatory regime, *see, e.g.*, *id.* at 35-36, and Plaintiffs have pointed to no "'operational costs beyond those normally expended' to carry out [their] advocacy mission." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *NTU*, 67 F.3d at 1434). It is well established that "a plaintiff 'cannot convert its ordinary program costs into an injury in fact,' unless the government's actions have required the organization to expend resources to pursue its mission." *Chesapeake Climate Action Network v. Ex.-Im. Bank of the U.S.*, 78 F.3d 208 (D.D.C. 2015). Plaintiffs set forth no facts to establish that withdrawal of LG2017 has "forced [them] to expend resources in a manner that keeps [them] from pursuing [their] true purpose" of advocating for fair housing. *NTU*, 68 F.3d at 1434. Whatever resources Plaintiffs expend on education, counseling, and advocacy have not been diverted from Plaintiff's "true purpose" but, rather, have directly advanced that mission.

Taking each proffered injury in turn illustrates why Plaintiffs lack standing. First, Plaintiffs contend that withdrawal of the tool is injurious because they have chosen to advocate for fair housing in areas where local governments would otherwise be required to prepare an AFH. But a plaintiff cannot establish standing when "the only 'service' impaired is pure issue-advocacy." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005). Indeed, the Court of Appeals "has not found standing when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities." *Id.* Even where Plaintiffs choose to forgo advocacy on different issues—such as hurricane-related issues, heir property, or zoning codes in Austin, Pls.' Mem. 36, 41—"this particular harm is self-inflicted; it results not

from any actions taken by [the defendant], but rather from the [plaintiff's] own budgetary choices." *EPIC v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 24 (D.D.C. 2014).

Next, Plaintiffs cite to expenses incurred in outreach and public education about the applicable AFFH policies in place, particularly surrounding the AFFH Rule. *E.g.*, Pls.' Mem. 40, 43. But this Circuit has made clear that "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch, Inc.*, 808 F.3d at 920. Plaintiffs do not allege, for example, that Defendants have impeded Plaintiffs' efforts to engage in public education, causing the organization to incur additional educational costs. *Cf. PETA v. USDA*, 797 F.3d 1087, 1097 (D.C. Cir. 2015). Rather, Plaintiffs assert that they must educate the public *about* Defendants' action, but that course of conduct is a normal expense for an organization that undertakes to educate the public about the current regulatory environment. *See, e.g.*, Pls.' Mem. 41. These costs are "expended by choice because such activities are at the core of [Plaintiffs'] mission[s]," and the "diversion of [Plaintiffs'] resources to educate the public about [the LG2017 withdrawal] is not a sufficient injury in fact." *EPIC*, 48 F. Supp. 3d at 24. An organizational plaintiff cannot create standing merely by educating the public about an agency action that they seek to challenge.

Plaintiffs also suggest that they are required to counsel members and communities about their legal rights vis-à-vis local governments participating in HUD programs. Pls.' Mem. 42-43. For the same reasons that advocacy and education do not confer standing, nor does counseling. Plaintiffs seem to suggest that any legal development on which they provide counseling is inherently injurious to the organization, but Plaintiffs provide these services in the normal course. Nothing about the withdrawal has impeded Plaintiffs from providing legal counseling.

18

That holds true regardless whether Plaintiffs choose to redirect some of their resources from counseling on one subject to another. *NTU*, 68 F.3d at 1434 ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

### B.  Plaintiffs cannot establish traceability or redressability.

Even if Plaintiffs had established injury, Plaintiffs have not established a "fairly traceable connection between the plaintiff's [alleged] injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  An injury must be attributable to the defendant, and "not the result of the independent action of some third party not before the court." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 561).  This limitation is particularly salient where, as here, "an agency's action relates to one party but a third party alleges harm." *Save Jobs USA v. DHS*, 210 F. Supp. 3d 1, 7 (D.D.C. 2016).  When a plaintiff is "not 'the object of the government action or inaction [it] challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *Morgan Drexen, Inc. v. CFPB*, 785 F. 3d 684, 689-90 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 562).

This difficulty arises from the disconnect inherent in a challenge to the government's regulation of a third party.  For a plaintiff bringing such a claim, it becomes "substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions." *Warth v. Seldin*, 422 U.S. 490, 505 (1975). Although a plaintiff may have standing "in a case that turns on third-party conduct," this Circuit has required "substantial evidence of a causal relationship between the government [action] and the third-party conduct, leaving little doubt as to causation." *Arpaio*, 797 F.3d at 20.

On this front, traceability and redressability are closely related.  To establish redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 561.  Because Plaintiffs assert indirect injury, they must establish facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff [seeks]."  *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).  If Plaintiffs rely on a "chain of allegations," the court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)."  *Arpaio*, 797 F.3d at 21 (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912-13 (D.C. Cir. 1989)).

Here, Plaintiffs' entire action is premised on an assumption that local governments will fail to meet their obligations to affirmatively further fair housing.  *See* Pls.' Mem. 35-43. Plaintiffs point to local governments in Texas—Hidalgo County and Corpus Christi, *id.* at 36, 39—where they claim they expend resources to address fair-housing issues.  By Plaintiffs' own account, they chose to expend these resources because they believe *these local governments* are not affirmatively furthering fair housing.  *See, e.g.*, *id.* at 38 ("Many Texas communities are deeply resistant to acknowledging or correcting their own histories of segregation and lack of fair housing.").  Plaintiffs present a litany of complaints about these local governments, all of which "hinge on the independent choices" of third parties not before the Court.  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004).  This lawsuit presents a classic case of a suit against the government to police the conduct of a third party.

Plaintiffs cannot satisfy the "more exacting scrutiny" required to establish traceability and redressability under these circumstances.  *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 419 (D.C. Cir. 1994).  Plaintiffs contend that their injuries are "caused" by the withdrawal of

LG2017.  Pls.' Mem. 35-43.  But program participants are required to certify that they will fulfill their obligation to affirmatively further fair housing as a condition for their receipt of public funds *regardless* whether the AI policy or the AFH policy applies.  *See, e.g.*, 83 Fed. Reg. at 23,927.  If a local government does not meet those obligations, it is "hard to imagine how any of the defendants [bear] responsibility for that outcome," *Common Cause v. Biden*, 748 F.3d 1280, 1285 (D.C. Cir. 2014), except perhaps if Plaintiffs are impermissibly seeking to challenge HUD's enforcement decisions.

In any event, the AFH approach does not guarantee outcomes different from the AI approach.  Although HUD adopted the Rule because it believed that the AFH process was "likely to lead to a more effective fair housing planning process," 80 Fed. Reg. at 42,312, the change is procedural.  The AFH does not obligate grantees to take any particular course of action, nor does HUD's acceptance of the AFH indicate fulfilment of AFFH obligations.  Local governments' compliance with their AFFH obligations depends "on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).

To wit, Plaintiffs must assume (1) that a covered HUD program participant is not meeting, or will not meet, its AFFH obligations; (2) that this program participant is a local government that would have conducted an AFH but for the withdrawal of LG2017; (3) that this program participant would have successfully conducted an AFH regardless of defects with LG2017; (4) that conducting an AFH instead of an AI definitively would have led the program participant to reach different conclusions in its fair housing planning process; (5) that any such steps taken in the planning process definitively would have led the participant to take concrete

actions solely traceable to the AFH mechanism; (6) that taking these steps would lead to fair-housing outcomes clearly traceable to the AFH process; and (7) that any such achievements in addressing fair-housing issues would leave Plaintiffs satisfied such that they no longer chose to spend resources on advocacy, education, or counseling in that community.

This chain of events is highly speculative, and "[t]he greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." *Am. Freedom Law Ctr.*, 821 F.3d at 49.  Plaintiffs' expenditures are rooted in assumptions about actions local governments will take in response to the withdrawal of LG2017, and Plaintiffs assume that an order directing HUD to reinstitute LG2017 would lead to different outcomes.  Plaintiffs can only speculate, and "a plaintiff's standing fails where it is merely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938.

## II.      Plaintiffs Fail to Establish a Likelihood of Success on the Merits.

Even if Plaintiffs could establish standing, their claims are meritless.  Plaintiffs raise three claims under the Administrative Procedure Act (APA), 5 U.S.C. § 706, arguing that HUD's withdrawal of LG2017 was (1) procedurally improper, (2) arbitrary and capricious, and (3) contrary to the Fair Housing Act.  But HUD followed appropriate procedures in pursuing a reasonable course of conduct in line with the Fair Housing Act, and Plaintiffs accordingly fail to establish the requisite likelihood of success.

### A.  The withdrawal of LG2017 was procedurally proper.

Plaintiffs first argue that HUD did not comply with APA notice-and-comment requirements, 5 U.S.C. § 553, when withdrawing LG2017, but these requirements do not apply to the Assessment Tools.  The APA requires federal agencies to undertake specific notice-and-

comment procedures before adopting "legislative" or "substantive" rules.  *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014).  Where this requirement applies, the agency must publish a notice of proposed rulemaking that includes "either the terms or substance of the Rule or a description of the subjects and issues involved," then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(b)(3), (c).

But LG2017 is not a legislative or substantive rule under the APA.  Rather, Assessment Tools are information-collection devices governed by the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501 *et seq*.  The PRA was enacted to reduce the burden of paperwork requests on the public, 44 U.S.C. § 3501(1), and sets forth rules governing "collections of information," defined as "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format."  *Id.* § 3502(3)(A).  There can be no question that the Assessment Tools meet this definition, as made clear in the AFFH Rule itself.  24 C.F.R. § 5.152; *see also, e.g.*, 80 Fed. Reg. at 42,352.

The PRA imposes procedural requirements for information-collection devices distinct from the APA's requirements for legislative or substantive rules.  For a proposed Assessment Tool, the PRA requires two periods of notice and comment.  *See* 44 U.S.C. §§ 3506-07.  HUD first must publish a notice in the Federal Register and allow sixty days for public comment.  *Id.* § 3506(c)(2)(A).  After considering the comments, HUD submits its information-collection request to the Director of OMB for review.  *Id.* § 3507(c)(3).  HUD then publishes a second notice to inform the public that the information-collection request has been submitted and that additional comments may be directed to OMB.  *Id.* § 3507(a)(1)(D).  OMB must allow 30 days for public comment prior to approving or disapproving the request.  *Id.* § 3507(b), (e)(1).

However, the PRA contains no notice-and-comment requirements for the withdrawal of an information collection. *See id.* §§ 3506-07. Indeed, the PRA requires expiration dates on collections, which may last no longer than three years. *Id.* § 3507(g). OMB may deny an extension of an existing collection and may reconsider its approval of a collection before its expiration. *See id.* §§ 3504(a)(1)(B)(i), (c)(1), 3507(h)(2); 5 C.F.R. § 1320.10(f); *see also, e.g.*, 48 Fed. Reg. 13,666, 13,683 (Mar. 31, 1983).

Plaintiffs nowhere even suggest that LG2017 is a legislative rule subject to notice and comment under the APA rather than the PRA. *See* Pls.' Mem. 17-21. Nor could they. *Cf. Mendoza*, 754 F.3d at 1021 (describing legislative rules). Plaintiffs instead contend that the withdrawal of LG2017 was improper for failure to abide by APA notice-and-comment procedures because of the tool's relationship to the AFFH Rule. Pls.' Mem. 19-20. In Plaintiffs' view, the automatic extension that went into effect following the withdrawal of LG2017—a feature of the AFFH Rule itself—is "tantamount to amending or revoking a rule." *Clean Air Council v. Pruitt*, 862 F.3d 1, 6, 9 (D.C. Cir. 2017); *see also* Pls.' Mem. 19 & n.4. In other words, Plaintiffs suggest that the Rule's automatic-extension provision exports any APA requirements applicable to the AFFH Rule (a legislative rule) to LG2017 (a PRA collection).

Plaintiffs have it is exactly backward. The automatic extension under 24 C.F.R. § 5.160(a)(1)(ii) is *part* of the duly promulgated AFFH Rule. The automatic extension is not tantamount to amending the Rule; it is a function of the Rule. HUD anticipated that an approved tool might not be in place when AFH submission requirements begin to run and provided for that eventuality. *See, e.g.*, HUD, AFFH Rule Guidebook 17 (2015) (explaining that the Rule "allows HUD flexibility in setting a later initial due date in the event that an Assessment Tool has not been issued and designated for use by a particular category of program participants"), *available*

24

*at* https://www.hudexchange.info/resources/documents/AFFH-Rule-Guidebook.pdf.  HUD

followed the letter of the Rule when it notified program participants that "the deadline for local

government program participants to submit a first AFH is . . . extended to a date not less than 9

months following the future publication of a revised and approved Local Government

Assessment Tool."  83 Fed. Reg. at 23,926.  The withdrawal of LG2017 does not "alter the rights

or interests of parties," *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir.

2000), or "impose any *new* legal obligation" on program participants, *United Source One, Inc. v.

USDA, Food Safety & Inspection Serv.,* 865 F.3d 710, 717 (D.C. Cir. 2017), *cert. denied sub*

*nom. United Source One, Inc. v. USDA*, 138 S. Ct. 1332 (2018), because any rights or obligations

are spelled out in the duly promulgated Rule.  *Cf. Kennecott Utah Copper Corp. v. U.S. Dep't of*

*Interior*, 88 F.3d 1191, 1207 (D.C. Cir. 1996).  In any event, the Rule did not change the

substantive obligation to affirmatively further fair housing, only a planning mechanism.

Lastly, Plaintiffs suggest that withdrawal of LG2017 must go through notice and

comment because "[n]othing in the Rule allows HUD to withdraw an Assessment Tool without

replacing it."  Pls.' Mem. 20.  Plaintiffs point to the definition of "Assessment Tool" in the

AFFH Rule, which provides that "the Assessment Tool will be subject to periodic notice and

opportunity to comment in order to maintain the approval of the Assessment Tool as granted by

the Office of Management and Budget (OMB) under the PRA."  24 C.F.R. § 5.152.  This

definition merely reiterates what the PRA requires:  OMB "may not approve a collection of

information for in excess of 3 years," and any extension must be approved by OMB.  44 U.S.C.

§ 3507(g), (h).  Plaintiffs read this recapitulation of a statutory requirement to prohibit HUD

from withdrawing a tool, but nothing in the text of the regulation suggests this reading.

To the contrary, the definition does not purport to override OMB's authority by prohibiting HUD from ever going without an approved tool. In adopting the Rule, HUD made clear that "the burden imposed by the Assessment Tool and additional Assessment Tools issued by HUD must, in accordance with the [PRA], be renewed for approval by [OMB] every 3 years, at which point the opportunity is also presented to assess whether the Assessment Tool is aiding fair housing planning as intended by this rule." 80 Fed. Reg. at 42,276. HUD thus contemplated that tools might turn out not to be successful or workable. Plaintiffs' contrary understanding is antithetical to the PRA, which does not contemplate permanent collections of information, and the Rule's definition section cannot bear the weight of Plaintiffs' expansive reading.

### B.  HUD acted reasonably in withdrawing LG2017.

Plaintiffs next argue that HUD's decision to withdraw LG2017 was so unreasonable as to require reinstatement of the tool on an emergency basis. But Plaintiffs ultimately "challenge[] the wisdom, not the lawfulness" of HUD's decision. *Intercity Transp. Co. v. United States*, 737 F.2d 103, 109 (D.C. Cir. 1984). Under the APA, an agency action may be set aside if the Court concludes that the action was arbitrary and capricious. 5 U.S.C. § 706(2)(A). "As the [APA] requires," the Court's review is "'highly deferential,'" *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017), and "narrow," limited to determining whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"In evaluating whether the agency has met this standard, the court must 'not substitute its own judgment for that of the agency.'" *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43) (alterations omitted). "Whether [the Court] would have

done what the agency did is immaterial," so long as the agency engages in an appropriate decisionmaking process. *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718 (D.C. Cir. 2016). To that end, the Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *United Source One, Inc.*, 865 F.3d at 716 (quoting *State Farm*, 463 U.S. at 43). In short, the question before the Court is whether the agency's decision "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

Here, the path to HUD's decision is readily discerned from the notice of withdrawal, which describes the basis for HUD's action at length. 83 Fed. Reg. at 23,923-26. HUD concluded that defects in LG2017 had led to a high failure rate for AFH submissions and undue burdens on HUD and grantees. *Id.* In response to these problems, HUD decided to withdraw LG2017, putting local governments back in the same position as all other program participants— states, insular areas, and PHAs—none of which have an Assessment Tool available to develop their AFHs. *Id.* HUD explained the facts found and drew rational connections between those facts and the choice made. *Id.*; *see also, e.g.*, Mills Decl. Ex. 2. Regardless whether Plaintiffs would have chosen differently, this discernible path to HUD's conclusion is all that is required to survive "highly deferential" arbitrary-and-capricious review. *Epsilon Elecs., Inc.*, 857 F.3d at 918. Plaintiffs offer five arguments to the contrary, all of which fail.

### 1.   HUD reasonably concluded that the high AFH failure rate evidenced significant defects with LG2017.

First, Plaintiffs argue that HUD did not explain why the high failure rate of the initial batch of 49 AFH submissions supported withdrawal. Pls.' Mem. 22-23. As HUD explained, only 18 of the initial 49 AFH submissions were determined to be acceptable on initial submission. 83 Fed. Reg. at 23,923. Another 14 AFHs were accepted only with revisions, and 17 were determined to be unacceptable, *id.*, some of which later were resubmitted and accepted.

Mills Decl. ¶¶ 12-15 & Exs. 1 (analysis), 6-8 (decision letters).  HUD concluded that this high

failure rate—63% of AFHs initially not acceptable—evidenced that LG2017 was "not working

as an effective device to assist program participants with the creation of acceptable and

meaningful AFHs with impactful fair housing goals."  83 Fed. Reg. at 23,923.  HUD reasoned

that the "failure rate evidenced substantial deficiencies in the Assessment Tool that, if not

addressed, would have imposed an insupportable burden upon HUD."  Mills Decl. ¶ 16.

Plaintiffs respond that a high failure rate is a feature of the tool, not a flaw, because the

revised AFHs accepted by HUD showed improvement from the initial submissions.  Pls.' Mem.

23.  That assertion confuses process with outcomes.  *Cf.* Mills Decl. ¶ 31.  The goal of the AFFH

Rule is to ensure that jurisdictions prepare adequate AFHs and plan for fair housing, not to make

program participants needlessly go through iterative revisions to achieve an acceptable AFH.

Plaintiffs do not suggest any inherent benefit in making program participants go through multiple

rounds of AFH submissions; there is no contention that initial failure followed by revision makes

an AFH more successful than an initial acceptance.  *See id.*  And here, where nearly two-thirds of

the initial AFH submissions could not be accepted, requiring additional expenditures of time and

resources on the part of both HUD and local governments, *see* 83 Fed. Reg. at 23,923-25, HUD

reasonably concluded that LG2017 failed to ensure that program participants understood the

instructions and completed the process correctly the first time, imposing needless costs.

Plaintiffs point out that the Rule anticipates initial non-acceptance of some AFHs and

builds in time for HUD to provide feedback for revisions.  Pls.' Mem. 23 (citing, *e.g.*, 24 C.F.R.

§ 5.162(a), (b)).  That should come as no surprise; the goal of the AFFH Rule is to improve fair

housing planning, not to deny grantees funding on the basis of inadequate paperwork.  But even

if the system tolerates initial failures, it is not unreasonable for HUD to conclude that the high

failure rate was a sign that LG2017 was deficient.  An Assessment Tool should be clear enough to guide program participants through the process and help them respond to prompts correctly in the first instance.  *See* 83 Fed. Reg. at 23,923-25.  And in adopting LG2017 HUD anticipated that these kinds of issues might only become clear after the tool went into use.  *See, e.g.*, 82 Fed. Reg. at 4391 (noting that "a more accurate estimate of the time and costs involved in preparing the AFH may not be known until program participants submit their AFHs" and that HUD "intend[ed] to monitor and assess the impact and burden of the AFH process").  Regardless whether Plaintiffs would have responded differently to a high failure rate, it was not unreasonable for HUD to conclude that there was a problem with the tool.

### 2.   HUD reasonably concluded that it lacked sufficient resources to continue implementing LG2017 in 2018 and 2019.

Second, Plaintiffs argue that the burdens created by the high AFH failure rate were not a reasonable basis for withdrawing LG2017, as HUD had considered those costs in promulgating the Rule.  Pls.' Mem. 24-25.  In the notice withdrawing LG2017, HUD acknowledged that it had "anticipated providing technical assistance to program participants to assist them in submitting acceptable assessments."  83 Fed. Reg. at 23,925.  But after implementing LG2017, HUD concluded that the unexpected burdens of guiding program participants through the AFH process made the tool unworkable.  As an initial matter, implementation of the Rule requires significant HUD staff resources, which go far beyond just review of AFHs.  Mills Decl. ¶ 18.  Staff in the Office of Fair Housing and Equal Opportunity (FHEO) provide pre-submission support to program participants, including "written correspondence, conference calls, in-person meetings, review of AFH drafts, and direct responses to questions from the program participant."  *Id.*  HUD staff also manage the provision of technical assistance by third-party contractors.  *Id.*

FHEO staff then review AFH submissions for acceptability and communicate with program participants about HUD's determination.  *Id.*; *see also, e.g.*, *id.* ¶¶ 19-20 (examples).

These duties are spread across FHEO, which has lost 23% of its workforce since 2010. Mills Decl. ¶ 28.  In light of competing workforce demands, HUD has allocated 24% of field FHEO offices' workloads to AFFH, which includes not only pre-submission support, technical assistance, and AFH reviews, but also reviewing subsequent planning and reporting documents (e.g., Consolidated and PHA Plans).  *Id.*  But the demands on FHEO staff for the initial round of 49 submissions "substantially exceeded initially anticipated levels."  *Id.*  Other HUD offices also "allotted significant resources in Headquarters" to "AFFH rule implementation and the review of AFHs."  *Id.* ¶ 30.  In the meantime, congressionally mandated demands on staff workloads have grown.  *Id.* ¶ 29.  HUD estimates that it currently "has only approximately 28 full-time equivalent employees available nationally to support all AFH reviews."  *Id.* ¶ 32.  Yet a consultation report has estimated that HUD would need 538 full-time employees "just to support AFH reviews during the peak submission period (i.e. 2019)."  *Id.*

HUD further found that "the level of technical assistance HUD provided" could not "be scaled up to accommodate the increase in the number of local government program participants with AFH submission deadlines in 2018 and 2019."  83 Fed. Reg. at 23,923.  Through third-party contractors, Mills Decl. ¶ 23, HUD "provided substantial technical assistance to [the] initial program participants, even for the AFHs that [were] approved."  83 Fed. Reg. at 23,925; *see also, e.g.*, Mills Decl. ¶ 19 (explaining that HUD spent $109,815.08 on direct assistance to Philadelphia, which submitted an acceptable AFH).  In total, HUD estimated that it spent "over $3.5 million on technical assistance for the initial round of 49 submissions."  83 Fed. Reg. at 23,925; *see also* Mills Decl. ¶ 23 & Ex. 9 (summarizing technical assistance).  This assistance

included product development, workshops and trainings, and substantial "direct" on-call assistance, meaning one-on-one technical assistance through on-site meetings and calls with a single program participant or regional collaborative.  Mills Decl. ¶ 24-27; *see also id.* Ex. 9. Indeed, HUD spent more than $300,000 alone on direct technical assistance.  *Id.* ¶ 26 & Ex. 9.

The volume of AFH submissions in this initial round is dwarfed by the "significant increase in submissions scheduled to occur in 2018 and 2019," 83 Fed. Reg. at 23,925, including 104 scheduled local-government submissions in 2018 and at least 682 in 2019.  Mills Decl. Ex. 13.  Because HUD "lacks the staff, funds, and other resources that would be necessary to continue to implement the LG2017 Tool," HUD "does not have the capacity to manage the increased workload in 2018 and 2019 while simultaneously working on improvements."  Mills Decl. ¶ 35; *see also* 83 Fed. Reg. at 23,925 (explaining HUD's conclusion that "[t]he level of technical assistance provided to the initial 49 participants could not be extended to these numbers of AFHs due in 2018 and 2019" because experience with the initial round evidenced that "a high percentage of AFHs in future rounds of submissions would not be initially acceptable").

This conclusion is borne out by the costs estimated in the AFFH Rule.  In promulgating the Rule, HUD had estimated "resource costs to HUD of $9 million annually."  80 Fed. Reg. at 42,273.  Importantly, these costs were for *all* HUD program participants in a given year— including states and PHAs—not just local governments.  *See id.* at 42,349-50.  Yet in reviewing just 49 AFHs, HUD spent $3.5 million—nearly a third of the estimate.  With at least 682 AFHs in 2019, HUD concluded that if LG2017 remained in place, "HUD would not be able to provide all program participants with the extent of assistance provided to the initial round of AFHs."  83 Fed. Reg. at 23,926.  And the absence of that assistance would "lead to a great deal of

uncertainty for program participants as to how to submit an acceptable AFH" and "lead to uncertainty regarding the status of [participants'] HUD-funded programs." *Id.* at 23,926.

HUD thus decided to withdraw the tool to "conserve HUD's limited resources, allowing HUD to use those limited resources more effectively to help program participants produce meaningful improvements in the communities they serve." 83 Fed. Reg. at 23,926. Courts have recognized that agencies have "broad discretion to choose how best to marshal [their] limited resources and personnel to carry out its delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007); *see also, e.g.*, *WildEarth Guardians v. EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014) (noting the "discretion to determine the timing and priorities of [a] regulatory agenda").

Plaintiffs also assert that any burdens identified should be discounted in light of the possibility that "per-submission" burdens will decrease as the volume increases, noting that the Rule anticipated that later-submitting jurisdictions would benefit from the experience of the initial submissions. Pls.' Mem. 25. Although HUD may have believed when promulgating the Rule that a learning curve would benefit later-submitting jurisdictions, experience suggests otherwise. Plaintiffs point to accepted AFHs as guideposts—for example, Philadelphia and Kansas City, *see id.*—but the AFHs are of such length and variety that their value in creating replicable models for distinct jurisdictions is not clear. *See, e.g.*, Mills Dec. ¶¶ 19-20 & Exs. 3-5 (sample AFHs). As HUD's decision letters illustrate, local governments in the initial round encountered a variety of issues that would not be addressed by looking to any particular accepted AFH. *See id.* Exs. 6-8. In any event, the existing guidance containing model answers—*see, e.g.*, AFFH Rule Guidebook 51-114—did not sufficiently alleviate issues with the tool.

Plaintiffs also suggest that burdens will decrease as HUD identifies recurring issues, like those found in the initially non-accepted AFHs. Pls.' Mem. 25-26. But HUD found "that

efficiency gains over time from experience working with the Tool would be unlikely to address HUD's concerns about . . . the inadequacy of the Tool." 83 Fed. Reg. at 23,924. Regardless of HUD's experience with the initial round, "program participants with future AFH due dates will require similar levels of technical assistance." Mills Decl. ¶ 27; *see also* 83 Fed. Reg. at 23,926 (explaining "that the level of technical assistance it has been required to provide to the initial 49 AFHs would [not] decrease meaningfully as [a] result of expanded usage of the Tool"). For example, "[g]uidance products are continually updated based on experience working with the Assessment Tool and with program participants," "[l]arge-group trainings and workshops" would continue as they are "provided in a targeted manner based upon impending AFH due dates," and "direct technical assistance" would still be necessary to "respond[] to the individualized needs of program participants." Mills Decl. ¶ 27. HUD reasonably concluded that any gains in efficiency were insufficient to overcome the burdens of the defective tool.

### 3.  HUD reasonably traced these issues to LG2017.

Third, Plaintiffs argue that HUD unreasonably attributed the high AFH failure rate to issues with LG2017. Pls.' Mem. 26-27. In Plaintiffs' view, any issues are "idiosyncratic rather than systemic," as "certain jurisdictions simply chose not to follow requirements that already were very clearly stated" or "take advantage of resources already at their disposal." *Id.* There are no issues with LG2017, Plaintiffs contend, only with local governments' ability to use LG2017. *See id.* This argument does not track. If the vast majority of local governments are unable to successfully use the tool, it matters little whether Plaintiffs believe that the tool is clear enough that they *should* be able to use the tool. The results show that they cannot. 83 Fed. Reg. at 23,923. And if the tool is not yielding the desired results, it is reasonable to conclude—as HUD did—that "a significant proportion of program participants had difficulty completing or

understanding how to use the Tool to complete acceptable AFHs" and that the tool would be workable only if it were "more effective in assisting program participants with the creation of meaningful assessments with impactful fair housing goals to help them plan to fulfill their legal obligation to affirmatively further fair housing."  83 Fed. Reg. at 23,923, 23,926; *see also, e.g.*, Mills Decl. ¶ 9 (explaining HUD's conclusion that "the Assessment Tool was not achieving its purpose of efficiently guiding local governments to produce sound and thorough AFHs").

In any event, HUD conducted an "analysis of the categories of problems observed" that was "generated based, in part, upon observations of consistent problems with responses to particular prompts."  Mills Decl. ¶ 17.  Although "[t]here may have been myriad issues that caused an individual AFH submission to have been non-accepted," HUD "identifie[d] some of the most consistent issues that have arisen" and concluded that "[i]n the aggregate" these issues "support the Department's conviction that the Assessment Tool is not as helpful or as clear as it could be."  *Id.* Ex. 2.  Plaintiffs challenge HUD's identification of issues, but in each case HUD's analysis is supported by the record.  For example, HUD highlighted local governments' failure to demonstrate adequate community participation, which HUD traced to deficient prompts that "vaguely incorporate by reference" other requirements and "do not explicitly state the specific requirements or ask that program participants explain how they met these specific requirements."  83 Fed. Reg. at 23,924.[1]  Plaintiffs also take issue with HUD's identification of issues with the

---

[1] The four community-participation questions include no substantive explanation of the standards, *see* LG2017, § III, at 1, ll. 4-21, and the instructions state only that "[f]or consolidated plan program participants, Citizen Participation requirements are described in 24 C.F.R. part 91."  *Id.* App'x A (Instructions) at 6, ll. 39-40.  In the withdrawal notice, HUD noted that one program participant failed to provide the requisite 30 days for comment; Plaintiffs respond that this information is clearly spelled out in 24 C.F.R. § 91.105(b)(4).  Pls.' Mem. 26.  But the 30-day requirement appears nowhere in LG2017, and HUD reasonably concluded that a "see" reference to 24 C.F.R. § 91.105 in the instructions was not sufficient.  83 Fed. Reg. at 23,924.

instructions to use local data and knowledge.  Pls.' Mem. 26.  HUD explained that local

governments had failed to address issues absent from the HUD-provided data and concluded that

the prompts in the tool were "inadequate to inform the program participants when to use local

data and knowledge."  83 Fed. Reg. at 23,924.[2]  Next, Plaintiffs raise questions about HUD's

identification of defects in the goals sections of the submitted AFHs.  Pls.' Mem. 26.  But HUD

explained why "the roadmap provided"—a table with column headers as prompts—was

"inadequate to lead to the development of effective goals."  *Id.*[3]

Lastly, Plaintiffs suggest that there is insufficient evidence that these issues are systemic

in nature rather than individualized to particular local governments.  Pls.' Mem. 27.  Plaintiffs

improbably suggest that two-thirds of local governments coincidentally happened to have issues

leading to the submission of AFHs that initially could not be accepted for one or more reasons,

unrelated to any issues with the prompts in LG2017.  Again, this assertion simply cannot be

squared with the high failure rate.  83 Fed. Reg. at 23,923.  Moreover, HUD expressly found that

these issues were not one-off errors confined to particular local governments.  HUD identified "a

pattern of problems with the initial 49 AFH submissions" across seven categories.  83 Fed. Reg.

---

[2] HUD pointed specifically to the section addressing disparities in access to opportunity, which requires program participants to analyze access to education, employment, transportation, low-poverty neighborhoods, and environmentally healthy neighborhoods.  *See* LG2017, § V.B.iii.1, at 4-5.  The prompts in this section require participants to use their "own local data and local knowledge" without elaborating further.  *See, e.g.,* LG2017, § V.B.iii.1, at 4, ll. 18, 26, 35.  HUD reasonably concluded that these bare references to local data and knowledge, coupled with similarly unadorned language in the instructions, *see* LG2017, App'x A (Instructions), at 13-16, did not provide sufficient guidance.

[3] This section contains two questions and a table to fill out.  LG2017, § VI, at 23.  HUD noted that in the initial AFH submissions "[g]oals were frequently overbroad or would not result in meaningful actions" and the metrics and milestones column of the table often was deficient.  83 Fed. Reg. at 23,925.  The discussion section also was often incomplete or vague.  *Id.*  The instructions in the appendix mainly recapitulate the column headers and provide broad guidance that offers little by way of concrete requirements.  *See* LG2017, App'x A (Instructions) at 40-41.

at 23,924; *see also* Mills Decl Ex. 2.  Further, the decision letters exhaustively explain the issues

repeatedly encountered by program participants.  *See* Mills Decl. Ex. 8.  HUD reasonably

concluded that, in aggregate, these issues evidenced a problem with the tool.

### 4.   HUD reasonably concluded that withdrawal of LG2017 was an appropriate means of addressing the issues identified.

Next, Plaintiffs suggest that HUD's decision to withdraw LG2017 was unreasonable

because HUD "failed to consider *any* alternatives, let alone adequately explain why they were

insufficient."  Pls.' Mem. 27.  Although the arbitrary-and-capricious standard "applies to an

agency's consideration of regulatory alternatives," it does not follow "that an agency must

consider all possible policy alternatives in reaching its decision."  *Am. Ass'n of Cosmetology*

*Schs. v. DeVos*, 258 F. Supp. 3d 50, 75 (D.D.C. 2017).  "Rather, an agency must consider only

'significant and viable' and 'obvious' alternatives."  *Nat'l Shooting Sports Found., Inc. v. Jones*,

716 F.3d 200, 215 (D.C. Cir. 2013).  This is not a procedural requirement of the APA; rather,

courts have concluded that it is unreasonable to summarily reject an alternative that has been

squarely presented, as in the cases Plaintiffs cite.  *See* Pls.' Mem. 28.  As Plaintiffs acknowledge,

agencies are not required to exhaustively inventory and consider every possible action.  *Id.*

Plaintiffs do not point to a significant, viable, and obvious alternative that HUD failed to

consider.  *Nat'l Shooting Sports Found., Inc.*, 716 F.3d at 215.  Plaintiffs suggest only that HUD

could have "provid[ed] additional guidance for jurisdictions regarding specific areas of

confusion while leaving the Assessment Tool in place."  Pls.' Mem. 28.  As an initial matter,

HUD concluded that it does not "have the capacity to manage the increased workload in 2018

and 2019 while simultaneously working on improvements" because of the burdens involved.

Mills Decl. ¶ 36.  But in any event, Plaintiffs fail to explain why additional guidance is a viable

alternative.  HUD already has provided an enormous amount of guidance to local governments

36

using LG2017, which nonetheless struggled to complete acceptable AFHs.  LG2017 contains

lengthy instructions, and HUD published a 225-page guide that explains how to use the tools.

*See* AFFH Rule Guidebook 40-121.  Plaintiffs do not explain why adding guidance on top of

guidance is an obvious and viable alternative.  HUD reasonably concluded that the issue with the

tool was fundamental.  *See* 83 Fed. Reg. at 23,926.

Plaintiffs also suggest that withdrawing LG2017 was unreasonable because HUD did not

outline exact changes it would make.  Pls.' Mem. 29.  Plaintiffs' demand that HUD continue to

implement an unworkable tool until it develops a replacement is not rooted in any requirement

under the APA.  HUD reasonably chose to engage in careful further consideration of the issues

without subjecting the agency to unworkable burdens.  83 Fed. Reg. at 23,926.  Regardless,

Plaintiffs' assertion that HUD has not identified specific issues is belied by the notice of

withdrawal, which identifies numerous issues, *see, e.g.*, *supra* at 33-35, and invites comments

from the public on the tool by July 23, 2018.  83 Fed. Reg. at 23,922.

### 5.  HUD reasonably withdrew LG2017 under the AFFH Rule.

Lastly, Plaintiffs suggest that HUD's decision to withdraw LG2017 was unreasonable

because HUD failed to consider the benefits of the AFFH Rule.  Pls.' Mem. 30-32.  This

argument rests on a contention that HUD took a "180 degree turn away" and "reverse[d] its

position."  *Id.* (quoting *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999)).

But that unsupported premise cannot be reconciled with the action HUD actually took.  HUD did

not "reverse" the AFFH Rule; rather, HUD withdrew LG2017 so that it could "use [its] limited

resources more effectively to help program participants produce meaningful improvements in the

communities they serve."  83 Fed. Reg. at 23,926.  And the withdrawal's immediate effect—the

automatic extension—is a feature of the Rule itself, not a "180 degree turn away."

Plaintiffs also offer no reason to believe HUD ignored the benefits of the AFFH Rule and the AFH process.  To the contrary, the withdrawal was motivated in part by a concern that HUD's inability to provide sufficient technical assistance in 2018 and 2019 would mar any progress made.  *See* 83 Fed. Reg. at 23,925-26.  HUD explained that the limited resources available to counteract a high failure rate "would lead to a great deal of uncertainty for program participants as to how to submit an acceptable AFH," which would, in turn, "lead to uncertainty regarding the status of [participants'] HUD-funded programs so long as they do not have an accepted AFH in place."  *Id.* at 23,926.  Rather than adopting a "policy change," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), HUD temporarily withdrew the current iteration of one tool, consistent with the policy.  *See* 83 Fed. Reg. at 23,925-26.

## C.  Withdrawal of LG2017 is not contrary to the Fair Housing Act.

Lastly, Plaintiffs contend that the withdrawal of LG2017 is contrary to the Fair Housing Act.  5 U.S.C. § 706(2)(A).  Under the APA, "agency actions will be set aside if they are contrary to law—if, in other words, they are not 'authorized by the statutory text.'"  *Fisher v. Pension Benefit Guar. Corp.*, 151 F. Supp. 3d 159, 165 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006)).  Here, Plaintiffs offer no evidence that the withdrawal of LG2017 "violates the relevant statutes and regulations," *Nio v. DHS*, 270 F. Supp. 3d 49 (D.D.C. 2017), or is "clearly counter to the plain language" of the Fair Housing Act.  *St. Vincent's Med. Ctr. v. Burwell*, 222 F. Supp. 3d 17, 22 (D.D.C. 2016).

Plaintiffs suggest that the withdrawal of LG2017 violates the Fair Housing Act's requirement that HUD affirmatively further fair housing in its programs.  Pls.' Mem. 32 (citing 42 U.S.C. § 3608(e)(5)).  But Plaintiffs' argument is rooted, again, not in anything particular about LG2017's role as an information-collection device, but rather in the reversion to the AI

process that results from the withdrawal.  *See id.* at 32-35.  In effect, Plaintiffs argue that not requiring local governments to prepare an AFH for upcoming Consolidated Plan cycles violates the Fair Housing Act.  This argument should be rejected out of hand.

The Fair Housing Act does not define what it means to "affirmatively further" fair housing, much less impose a requirement on HUD to mandate an AFH.  *See* 42 U.S.C. § 3608(e)(5); 80 Fed. Reg. at 42,274.  The AFFH Rule is a policy of recent vintage developed to help grantees better implement the AFFH mandate, but there can be no serious claim that any particular facet of the Rule is affirmatively *required* by the Fair Housing Act.  At bottom, Plaintiffs' claim is that requiring grantees to certify that they are affirmatively furthering fair housing and will prepare an AI violates 42 U.S.C. § 3608(e)(5), but they find no basis in the statute for that conclusion.  Grantees have an independent obligation to affirmatively further fair housing, regardless whether they conduct an AFH or an AI.  *See, e.g.*, 42 U.S.C. §§ 12705(b)(15), 1437c-1(d)(16), 5304(b)(2), 5306(d)(7)(B).  HUD and the public hold them accountable for affirmatively furthering fair housing, not for procedures to further fair housing planning.  *See* 80 Fed. Reg. at 42,313 (noting that HUD "already has the authority to enforce this statutory obligation" through various statutes, including the Fair Housing Act, in explaining why a planning process like the AFH did not require a separate enforcement provision).

Further, in the AFFH Rule, HUD exercised its broad discretion to adopt a rule that expressly provided for the continuation of the AI process for years pending the effective date of future AFH obligations, and that interpretation of the statute undoubtedly is permissible.  *Cf. Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016) (describing deference to agency interpretations of statutes), *cert. denied sub nom. Citizens Against Reservation Shopping v. Zinke*, 137 S. Ct. 1433 (2017).  Plaintiffs notably take no issue

with the AFFH Rule's express allowance for many grantees to continue certifying AFFH through the AI process—as has been the case for states and insular areas, which have no tool, and PHAs, which have a tool that has not yet been made operable.  82 Fed. Reg. at 4373; *see also, e.g.*, 80 Fed. Reg. at 42,276.  Plaintiffs' brief conspicuously lacks any suggestion that HUD is violating the Fair Housing Act by requiring these other program participants to continue conducting an AI pending an approved tool, and the withdrawal of LG2017 put covered local governments in the exact same position as all other program participants subject to the AFFH Rule.

Lastly, Plaintiffs' citations to authority offer scant support for their claim.  None of the cases cited held that requiring grantees to conduct an AI and certify AFFH compliance violates the Fair Housing Act.  *See NAACP v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 158 (1st Cir. 1987); *Otero v. N.Y.C. Hous. Auth.*, 484 F.2d 1122, 1133-34 (2d Cir. 1973); *Shannon v. HUD*, 436 F.2d 809, 821 (3d Cir. 1970); *Thompson v. HUD*, 348 F. Supp. 2d 398, 465 (D. Md. 2005).  This Court would be the first.  To reach that conclusion, the Court implicitly would rule that the AFFH Rule itself violates the Fair Housing Act, because the Rule contemplates that many jurisdictions will continue to conduct an AI and certify AFFH compliance for some time.  24 C.F.R. § 5.151.  Plaintiffs ask this Court to write AFHs into the Fair Housing Act, but this Court lacks authority to impose additional obligations beyond those imposed by Congress.

### III.     Plaintiffs Have Not Shown that Irreparable Harm Will Result If This Court Does Not Reinstate LG2017 on an Emergency Basis.

Plaintiffs also have not met their burden of demonstrating irreparable harm.  The D.C. Circuit "has set a high standard for irreparable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), and "a plaintiff must, at minimum, 'demonstrate that irreparable harm is *likely* in the absence of an injunction,' not just that injury is a 'possibility.'"  *Arriva Med. LLC v. HHS*, 239 F. Supp. 3d 266, 277 (D.D.C. 2017) (quoting

*Winter*, 555 U.S. at 21).   To meet this high standard, "[t]he party seeking a preliminary injunction must make two showings."  *League of Women Voters*, 838 F.3d at 7.  First, "[t]he moving party must show '[t]he injury complained of is of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'"  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)).  And second, "the injury must be beyond remediation."  *Id.*

Plaintiffs fail to establish irreparable harm for the same reasons they lack a cognizable Article III injury to bring this suit.  As in the standing context, this Circuit has required an organizational plaintiff seeking emergency relief to establish that "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs."  *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp.*, 455 U.S. at 379).  Plaintiffs' expenditures on advocacy, education, and counseling cannot sustain a claim of cognizable harm.  *See supra at* 15-18.  And any such expenditures can provide no support for a claim of irreparable harm because "many of the injuries Plaintiffs claim will befall them are speculative and dependent on the actions of third parties."  *Cayuga Nation v. Zinke*, No. 17-cv-1923 (CKK), 2018 WL 1515239, at *7 (D.D.C. Mar. 27, 2018).

Moreover, even if Plaintiffs could make out an organizational harm, it would not be an *irreparable* harm.  There is no imminent deadline hanging over Plaintiffs' head, nor do Plaintiffs point to any impending harm particularized to LG2017.  Plaintiffs object broadly to HUD's implementation of the Rule and complain of their own budgetary choices in response, but any such harm is not "certain, great, actual, and imminent."  *Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (citing *Wisc. Gas Co.*, 758 F.2d at 674).  These harms do not

"creat[e] a clear and present need for extraordinary equitable relief to prevent harm." *Pinson v. DOJ*, 273 F. Supp. 3d 1, 13 (D.D.C. 2017) (quoting *Wisc. Gas Co.*, 758 F.2d at 674).

In any event, to obtain a preliminary injunction, Plaintiffs must show not only that they are suffering emergent and irreparable harm, but also that the equitable relief sought will prevent that harm. *See Chaplaincy*, 454 F.3d at 297. For many of the same reasons Plaintiffs' asserted Article III injuries are not traceable to HUD or redressable by this Court, Plaintiffs have failed to explain why a preliminary injunction would cure what purportedly ails them. *See supra* at 18-22. In particular, Plaintiffs have not explained why an emergency injunction reinstating LG2017 on a preliminary basis—in effect, requiring HUD to immediately shift course back to requiring AFHs rather than AIs for covered program participants *pendente lite*—would in any way address their alleged harms of expenditures on education, counseling, and advocacy.

Indeed, preliminary relief likely would *exacerbate* rather than ameliorate this situation. An order temporarily reinstating LG2017 would create confusion about program participants' long-term obligations. If Plaintiffs' alleged harm is education, counseling, and advocacy about the effects of changes in HUD requirements, that harm would be *increased*—not prevented—by a potentially temporary shift back to the AFH policy on an emergency basis without any certainty that another shift back to the AI policy is not coming down the road at final judgment. *See also infra* at 44-45. Because this case is about long-term planning, not an imminent future event, the relief Plaintiffs seek would have the effect of potentially delaying the culmination of any proper AFFH planning process by throwing the entire process into disarray.

## IV. The Public Interest and Balance of Equities Weigh in Favor of the Government.

Lastly, Plaintiffs cannot establish that the equities and the public interest favor granting the extraordinary remedy of emergency relief. These final two factors of the preliminary-

injunction analysis merge in cases where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). As an initial matter, Plaintiffs note that "[t]here is generally no public interest in the perpetuation of unlawful agency action," which is of course the case. Pls.' Mem. 44 (quoting *League of Women Voters*, 838 F.3d at 12). Plaintiffs presume that HUD is violating the law, but Plaintiffs are unlikely to succeed on the merits of their claims, "meaning that a preliminary injunction would likely have no effect on public officials' compliance with the law." *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 68 (D.D.C. 2017).

More importantly, ordering HUD to reinstate LG2017 on a provisional, emergency basis would cause HUD and the public serious harms. As detailed above, HUD lacks the resources necessary to address the deficiencies in LG2017 for the hundreds of local governments that would be required to submit AFHs should LG2017 be reinstated. 83 Fed. Reg. at 23,926; *see also supra* at 27-38. HUD would be required to begin preparations to accommodate a massive increase in AFH submissions—without sufficient resources—on the basis of a preliminary, temporary order. Beyond the costs identified above, HUD would be required to resume operation of the User Interface (UI), the online interface used by program participants to submit AFHs, which would require the engagement of a third-party contractors. Mills Decl. ¶ 33. And FHEO—the relevant HUD office—also would need to make substantial reallocations of resources to maintain the necessary involvement in AFH reviews. *Id.* ¶¶ 32, 34-35.

Consequently, many local governments would run the risk of endangering their receipt of federal funds should HUD prove unable to guide them through the AFH process using the

defective tool.  *See id.*  Denying local governments public funds to create fair housing opportunities surely is not in the public interest.  Moreover, reinstating LG2017 would lead to the reinstitution of long-term planning deadlines on a temporary, emergency basis without any certainty about ultimate obligations.  This disruption to long-term planning processes is firmly against the public interest.  *See, e.g.*, *AARP*, 226 F. Supp. 3d at 25-26 (denying preliminary injunction that would cause "considerable disruption" to long-term planning processes and "uncertainty" for regulated entities); *Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 74-75 (D.D.C. 2015) (denying preliminary injunction that would have a "disruptive effect" on third parties' reliance interests); *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 33 (D.D.C. 2006) (noting the harms to numerous third parties in denying preliminary injunction), *aff'd sub nom. Sandoz Inc. v. FDA*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006).

**V.      Final Judgment Is Inappropriate at This Early Stage.**

In addition to seeking emergency relief, Plaintiffs also move this Court to enter summary judgment on the basis of the preliminary-injunction papers.  Yet the Supreme Court has made clear that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  And the Court of Appeals has confirmed that "a preliminary injunction should not work to give a party essentially the full relief he seeks on the merits."  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (*per curiam*).

Although Plaintiffs here formally move for summary judgment, their papers provide no basis for awarding final judgment other than those offered in support of the preliminary injunction.  And in any event, the same concerns militate against entry of final judgment at this early stage of the litigation, regardless of the form of the motion.  Courts in this district have

resisted requests to grant "a summary ruling on the parties' underlying dispute, without the aid of additional factual support and briefing generally available in assessing traditional dispositive motions." *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 7 (D.D.C. 2015).

That is especially true where, as here, a party moves for summary judgment in an APA matter. As noted above, summary judgment in an APA matter "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," *Gentiva Healthcare Corp.*, 857 F. Supp. 2d at 6, and the district court "reviews the decision as an appellate court addressing issues of law." *Henry v. Sec'y of Treasury*, 266 F. Supp. 3d 80, 86 (D.D.C. 2017). Here, it would be premature to grant summary judgment on an APA claim where the administrative record is not yet before the Court and the agency has not yet had sufficient time to compile and certify a proper record to enable this Court's full review under the APA. *See* LCvR 7(n).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction and for expedited summary judgment.

Date: June 12, 2018                                      Respectfully submitted,

                                                        CHAD A. READLER
                                                        Acting Assistant Attorney General

                                                        LESLEY FARBY
                                                        Assistant Branch Director

                                                        */s/ Daniel Halainen*
                                                        DANIEL HALAINEN (MA Bar 694582)
                                                        Trial Attorney, Federal Programs Branch
                                                        U.S. Department of Justice, Civil Division
                                                        20 Massachusetts Avenue, NW
                                                        Washington, DC 20530
                                                        (202) 616-8101 (office)
                                                        (202) 616-8470 (fax)

45

daniel.j.halainen@usdoj.gov

*Counsel for Defendants*